AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>The residence located at 54022 Turning Leaf Drive,<br>Callahan, Florida 32011, as further described in<br>Attachment A | )<br>)<br>)<br>)<br>)<br>)    Case No. 3:20-mj- *1364-MCR* |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

the residence located at 54022 Turning Leaf Drive, Callahan, Florida 32011, as further described in Attachment A.

located in the _____ Middle _____ District of _____ Florida _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 2252 & 2252A | Possession, receipt, transportation and distribution of child exploitation material |

The application is based on these facts:
See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ashley Wilson, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ and 41(d)(3) over the telephone. _____ *(specify reliable electronic means).*

Date: **10/16/20**

_____
*Judge's signature*

City and state:   Jacksonville, Florida

Monte C. Richardson, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Ashley Wilson, being duly sworn, hereby state as follows:

1.     I am a Special Agent (SA) with Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), an agency of the United States Department of Homeland Security (DHS), and have been so employed since October 2007. I am currently assigned to the Office of the Assistant Special Agent in Charge Jacksonville, Florida, where I conduct a variety of investigations. Prior to this assignment, I was assigned to the Office of the Deputy Special Agent in Charge Laredo, Texas for approximately 6 years also as a Special Agent. I have a Bachelor's degree in Criminal Justice. I am a law enforcement officer of the United States and am thus authorized by law to engage in or supervise the prevention, detection, investigation or prosecution of violations of federal criminal law. I am responsible for enforcing federal criminal statutes under the jurisdiction of HSI, including violations of law involving the exploitation of children. I participated in a 22-week training program at the Federal Law Enforcement Training Center in Brunswick, Georgia, which included the Criminal Investigator Training Program and ICE Special Agent Training. In my capacity as a Special Agent, I have participated in numerous types of investigations, during which I conducted or participated in physical surveillance, undercover transactions and operations, historical investigations, and other complex investigations. Since becoming a Special Agent, I have worked with experienced Special Agents and state and local law enforcement officers who also investigate child exploitation offenses.

2.     I have investigated and assisted in the investigation of criminal matters

involving the sexual exploitation of children that constituted violations of 18 U.S.C. §§ 2251, 2252, 2252A, 2422, and 2423, as well as Florida state statutes that criminalize sexual activity with minors and other methods of child sexual exploitation. In connection with such investigations, I have served as case agent and have served as an undercover agent in online child exploitation cases. During the course of my investigations, I have worked closely with members of the local child exploitation task force comprised of agents and officers from HSI, the Federal Bureau of Investigation (FBI), the Florida Department of Law Enforcement (FDLE), the Jacksonville Sheriff's Office (JSO), the St. Johns County Sheriff's Office (SJSO), and the Clay County Sheriff's Office (CCSO), among other agencies. These agencies routinely share information involving the characteristics of child sex offenders as well as investigative techniques and leads. As a federal agent, I am authorized to investigate and assist in the prosecution of violations of laws of the United States, and to execute search warrants and arrest warrants issued by federal and state courts.

3.      This affidavit is based upon my personal knowledge, experience and training, as well as other information developed during the course of this investigation. Because this affidavit is being submitted for the limited purpose of establishing probable cause and securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that contraband, fruits, instrumentalities, other items illegally possessed and evidence of violations of 18 U.S.C. §§ 2252 and/or 2252A, are present in the location to be searched.

2

4.      I am requesting authority to search the residence specifically identified in Attachment A, which includes the physical structure, as well as any computer and computer media and electronic storage devices located therein. I also request to seize any and all items listed in Attachment B as instrumentalities, fruits, and/or evidence of criminal activity specified herein. I also request that this Court authorize law enforcement officers to press the finger(s) (including thumbs) of Robert Ginder to any Apple iPhone device's fingerprint sensor (if one exists), or present his/her iris or face to the device's camera during the search of the residence in an attempt to unlock the device(s) for the purpose of executing the search authorized by this warrant.[1]

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors. Based upon my

---

[1] Based on my training and experience and legal instruction by Assistant U.S. Attorney Kelly S. Karase, I know that a person's "identifying physical characteristic[s]" are not testimonial and thus fall "outside [the] protection" of the Fifth Amendment. *Gilbert v. California*, 388 U.S. 263, 267 (1967). The privilege against self-incrimination is not violated by an order compelling a person to submit to photographing and measurements or to provide fingerprints, writing samples, or voice exemplars. *See, e.g., United States v. Dionisio*, 410 U.S. 1, 7 (1973); *California v. Byers*, 402 U.S. 424, 431-32 (1971); *Gilbert*, 388 U.S. at 266-67; *Schmerber v. California*, 384 U.S. 757, 763-64 & n.8 (1966); *see also In the Matter of the Search of [Redacted] Washington, District of Columbia*, 2018 WL 3155596 (D.D.C. 2018) (search warrant authorizing compelled use of biometric feature to unlock devices did not violate Fourth or Fifth Amendments); *Matter of single-family home & attached garage*, 279 F.Supp.3d 800  (N.D. Ill. 2017) (finding the government's application to require the fingerprint seizure of the four residents of a home does not violate the privilege against self-incrimination set forth in the Fifth Amendment); and *Matter of Search Warrant Application for cellular telephone in United States v. Anthony Barrera,* No. 19 CR 439, 2019 WL 6253812, at *7 (N.D. Ill. Nov. 22, 2019) (holding that compelling an individual to scan their biometrics, particularly their fingerprints, to unlock a smartphone device neither violates the Fourth nor the Fifth Amendment).

training and experience, as well as conversations with other experienced law enforcement officers, computer forensic examiners, and federal prosecutors, I know the following:

      a.    18 U.S.C. § 2252(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing or accessing with intent to view any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails.

      b.    18 U.S.C. § 2252A(a) in pertinent part prohibits a person from knowingly transporting, shipping, receiving, distributing, reproducing for distribution, possessing, or accessing with intent to view any child pornography, as defined in 18 U.S.C. § 2256(8), using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer.

      c.    18 U.S.C. § 2252(a)(1) prohibits a person from knowingly transporting or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, including by computer or mails, any visual depiction of minors engaging in sexually explicit conduct. Under 18 U.S.C. § 2252(a)(2), it is a federal crime for any person to knowingly receive or distribute, by any means including by computer, any visual depiction of minors engaging in sexually explicit conduct using any means or facility of interstate or foreign commerce or that has been mailed or shipped or transported in or affecting interstate or foreign commerce. That section also makes it a federal crime for any person to knowingly reproduce any visual depiction of minors engaging in sexually explicit conduct for distribution using any means or facility of

4

interstate or foreign commerce or in or affecting interstate or foreign commerce or through the mails. Under 18 U.S.C. § 2252(a)(4), it is also a crime for a person to knowingly possess or knowingly access with intent to view, one or more books, magazines, periodicals, films, or other materials which contain visual depictions of minors engaged in sexually explicit conduct that have been mailed, or have been shipped or transported using any means or facility of interstate or foreign commerce or in and affecting interstate or foreign commerce, or which were produced using materials which have been mailed or so shipped or transported, by any means including by computer.

   d.  18 U.S.C. § 2252A(a)(1) prohibits a person from knowingly mailing, transporting, or shipping using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, any child pornography. 18 U.S.C. § 2252A(a)(2) prohibits a person from knowingly receiving or distributing any child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(3) prohibits a person from knowingly reproducing child pornography for distribution through the mails or in or affecting interstate or foreign commerce by any means, including by computer. 18 U.S.C. § 2252A(a)(5)(B) prohibits a person from knowingly possessing or knowingly accessing with intent to view any book, magazine, periodical, film, videotape, computer disk, or other material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by

5

computer, or that was produced using materials that have been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.      The following definitions apply to this Affidavit:

a.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit poses or positions.

b.   "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct). *See* 18 U.S.C. §§ 2252 and 2256(2).

c.   "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format. *See* 18 U.S.C. § 2256(5).

d.   "Sexually explicit conduct" means actual or simulated (a) sexual intercourse,

6

including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. *See* 18 U.S.C. § 2256(2).

e.   "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.   "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly

7

includes programs to run operating systems, applications, and utilities.

h. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), personal digital assistants (PDAs), multimedia cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or

8

unusable, as well as reverse the progress to restore it.

j.    "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) may assign a unique and different number to a computer at different times that it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

k.    "Wireless telephone" (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Many wireless telephones are minicomputers or "smart phones" with immense storage capacity.

l.    A "digital camera" is a camera that records pictures as digital picture files,

9

rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

m. A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

n. Individuals often use a Virtual Private Network (VPN) in an attempt to remain anonymous while connected to the internet. A VPN is typically a paid service that keeps an individual's web browsing secure and private. In some cases, VPNs can get past regional restrictions for various video and music-streaming sites and help individuals evade government censorship restrictions. Based on my training and experience, and conversations with other law enforcement officers, a VPN can also be used by individuals involved in illegal activity on the internet to avoid being detected by law enforcement. A

VPN can be thought of as a secure tunnel between a user's computer, or any other internet-enabled device, and the destinations a user visits on the internet. The user's computer, or other internet-enabled device, connects to a VPN server, which can be located in the United States or any other foreign country. The VPN user's activity on the internet is then passed back and forth through that specific server, and as a result, it appears the user is browsing the internet from that server's geographical location instead of the user's actual computer or internet-enable device.

## COMPUTERS AND CHILD PORNOGRAPHY

7.     Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. In the past, child pornography was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and significant skill to develop and reproduce the images. There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

8.     The development of computers has radically changed the way that child pornographers manufacture, obtain, distribute and store their contraband. Computers

11

basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

9.     Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner. Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device. Digital cameras, as well as "smart" phones such as the Android device, have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

10.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

11.     The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

12.     Collectors and distributors of child pornography frequently use online

12

resources to retrieve and store child pornography, including services offered by Internet portals such as Yahoo!, Hotmail, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

13.     As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes.  Storing this information can be intentional, i.e., by saving an email as a file on the computer or saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography

13

investigations, as they can record communication in transcript form, often show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains peer-to-peer software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

14.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Computer storage devices (e.g., hard drives, compact disks ("CDs"), diskettes, tapes, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can

14

take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis. Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media by a computer user.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15.  Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who collect child pornography. I have observed and/or learned about the reliability of these commonalities

15

and conclusions involving individuals who collect, produce and trade images of child pornography. Based upon my training and experience, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

a.   Many individuals who traffic in and trade images of child pornography also collect child pornography. Many individuals who collect child pornography have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

b.   Many individuals who collect child pornography also collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

c.   Many individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, Peer-to-Peer (P2P), email, email groups, bulletin boards, Internet Relay Chat Rooms

16

(IRC), newsgroups, instant messaging, and other similar vehicles.

d.   Some individuals who collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

e.   Some individuals who collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange, or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

f.   Many individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. These individuals may protect their illicit materials by passwords, encryption, and other security measures; save it on movable media such as

17

CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted; or send it to third party image storage sites via the Internet. Based on my training and experience, as well as my conversations with other experienced law enforcement officers who conduct child exploitation investigations, I know that individuals who possess, receive, and/or distribute child pornography by computer devices using the Internet often maintain and/or possess the items listed in Attachment B.

16.     As stated in substance above and based upon my training and experience, as well as my conversations with other experienced law enforcement officers, I know that individuals who collect and trade child pornography often do not willfully dispose of their child pornography collections, even after contact with law enforcement officials. For example, I learned from HSI Special Agent (SA) Anthony Algozzini of an investigation he conducted in 2016 in the Middle District of Florida, in which the subject had his residence searched in July 2016 pursuant to a state search warrant and his wireless telephone and computer tablet seized by the Jacksonville Sheriff's Office. The search of these devices revealed the subject knowingly possessed several images of child pornography. The subject was made aware of the ongoing investigation into the subject's commission of child pornography offenses. Approximately three months later, the subject was arrested on federal child pornography charges. On the same day as the subject's arrest, HSI executed a federal search warrant and seized a wireless telephone acquired and used by the subject after the execution of the state search warrant at his residence. Subsequent forensic examination of this wireless telephone revealed that the subject had

18

received, possessed and viewed images of child pornography numerous times on his new device after the execution of the state search warrant and before his federal arrest.

17.    Based on my training and experience, I also know that, with the development of faster Internet download speed and the growth of file-sharing networks and other platforms through which individuals may trade child pornography, some individuals also have been found to download, view, and then delete child pornography on their computers or digital devices on a cyclical and repetitive basis. However, as referenced above, evidence of such activity, including deleted child pornography, often can be located on these individuals' computers and digital devices using forensic tools. Furthermore, even in instances in which an individual engages in a cycle of downloading, viewing, and deleting images, a selection of favorite images involving a particular child or act is often maintained on the device.

18.    Based on my training and experience, I know that within the last several years, individuals who have a sexual interest in minor children have used the internet and internet-enabled devices with increasing frequency to make contact with and attempt to establish relationships with potential child victims. These individuals may perceive that the internet provides some degree of anonymity and safety from prosecution. Because more and more children are using the internet and internet enabled devices, these individuals potentially expose more and more child victims to online sexual exploitation. These individuals may contact potential child victims through social networking websites such as Facebook and Twitter or may engage in online conversations with children through text messaging and email. During these online conversations, photographic

19

images and links to internet websites can be easily exchanged between the individual and the targeted child. Based on my training and experience, I know that when such an individual uses text messaging, email, or other websites to have online contact with children, the internet-enabled device used, whether it is a computer, a cellular telephone, a "smart" phone such as an Android device, or a tablet such as an "iPad," often saves and maintains evidence of such contacts. This evidence can often be extracted and examined by a trained forensic examiner.

## CHAT APPLICATION A INFORMATION

19.     The following information has been provided to me by other experienced law enforcement officers and also comes from online research that I have conducted as well as my training and experience. This investigation involves a secure chat platform, herein referred to as Chat Application A.[2] Chat Application A is a communications platform based in the United States. Service is offered through a web-based application for Window, Linux, and iOS operating systems, along with mobile applications available for Android and iOS operating systems. Chat Application A service includes instant messaging, voice calls, video calls, and file sharing capabilities. To create and

---

[2] Law enforcement knows the actual name of Chat Application A. However, the investigation into users of Chat Application A remains ongoing, and public disclosure of Chat Application A's actual name would potentially alert its members to the investigation, likely provoking members to notify other members of the investigation, to flee, and/or destroy evidence. Accordingly, to preserve the confidentiality and integrity of the ongoing investigation, the actual name and other identifying details of Chat Application A remain undisclosed in this affidavit.

subsequently log into a Chat Application A, a user must provide a username and a unique password. Communication on Chat Application A is end-to-end encrypted and stored locally on the device used, meaning only the user can decrypt content stored on the device accessing Chat Application A. Communication on Chat Application A is ephemeral; Chat Application A offers various burn-on-read time settings.

20.     Based on my training and experience, I know Chat Application A is often used for illegal activity, including the exchange and access of child pornography, because of the high degree of anonymity that is afforded to users during the use of the website.

## CLOUD PLATFORM A INFORMATION

21.     The following information has been provided to me by other experienced law enforcement officers and also comes from online research that I have conducted, as well as my training and experience. This investigation involves a secure cloud storage and file hosting service, herein referred to as Cloud Platform A.[3] Cloud Platform A supplies communication services to a global audience and can be used from all major devices. Cloud Platform A provides encrypted, cloud-based services that enable private, secure online storage, communication, and collaboration for businesses and individuals. Cloud Platform A offers 50 gigabyte (GB) of storage space for free on a month trial and up to 16

---

[3] Law enforcement knows the actual name of Cloud Platform A. However, the investigation into users of Cloud Platform A remains ongoing, and public disclosure of Cloud Platform A's actual name would potentially alert its members to the investigation, likely provoking members to notify other members of the investigation, to flee, and/or destroy evidence. Accordingly, to preserve the confidentiality and integrity of the ongoing investigation, the actual name and other identifying details of Cloud Platform A remain undisclosed in this affidavit.

terabyte (TB) for paid accounts.

22.     Users of Cloud Platform A can securely exchange text messages and have audio, video, or group calls with the chat function, automatically back up photos and videos from mobile devices, synchronize between a computer and the secure cloud, and export secure links to files and folders, or share folders directly with other Chat Platform A contacts. To enter a chat room on Cloud Platform A, the user must have the link and encryption key to the chat room, which can be provided via hyperlink from one Cloud Platform A user to another. Users within a chat room may chat and upload files which may be viewed and/or downloaded by other users in the chat room. Prior to joining the encrypted chat room, an invited user has the freedom to browse all previously uploaded conversations, image files, and video files since the inception of the chat room. Browsing the chat room content after being invited does not automatically cause the user to join the chat room. A user must manually join the chat room after having been invited.

23.     The website and service was launched on January 19, 2013, and is offered primarily through web-based applications. Mobile applications for Cloud Platform A are also available for Windows Phone, Android, and iOS. Based on my training and experience, and previous investigations I have conducted, I know Cloud Platform A is often used for illegal activity, to include the sharing and distribution of files that contain child exploitation material.

## FACTS ESTABLISHING PROBABLE CAUSE

24.     I make this affidavit in support of a search warrant for the premises located at 54022 Turning Leaf Drive, Callahan, Florida 32011, "Subject Location," that I believe to

be currently occupied by Robert Arthur Ginder (date of birth XX/XX/1985) and Andree Michelle Ginder (date of birth XX/XX/1985) after conducting physical surveillance at the Subject Location and querying multiple investigative databases. This affidavit is based upon information provided to me both verbally and in written documentation from other law enforcement officers and personnel, as well as through investigation that I personally conducted as set forth herein. I have personally observed the residence, and it appears as set forth in Attachment A.

25.     In September 2020, I received a collateral investigation from HSI SA Cristian Saenz, who is currently assigned to the HSI office in San Diego, California. During the investigation, HSI SAs received a link with files containing child exploitation material after assuming the online identity of an individual during the execution of a federal residential search warrant in the Southern District of California. I have reviewed all of the information, reports, and files containing child exploitation material that were provided to me by HSI SA Saenz. I have also had several phone conversations with HSI SA Saenz about the investigation he initiated in July 2019.

26.     In July 2019, HSI San Diego executed a federal residential search warrant within the Southern District of California for violations of 18 U.S.C. § 2252 – Certain Activities Relating to Material Involving the Sexual Exploitation of Minors. During the service of the warrant, the subject of the investigation consented to allow HSI San Diego agents to assume his online identity to a secure, end-to-end encrypted chat platform (herein referred to as Chat Application A). Several large group chats within Chat Application A were created by other parties and added the assumed account. Various

23

image and video files depicting child pornography are routinely shared within these group chats, along with cloud-storage web links containing files depicting child pornography. On or about July 12, 2020, the assumed account was added to a group chat on Chat Application A containing many unidentified participants.

27.    On or about July 14, 2020, within the newly added group chat the assumed account was added to, a user distributed a web link invitation to a secure, end-to-end encrypted cloud-storage platform (herein referred to as Cloud Platform A).

28.    On or about July 15, 2020, HSI San Diego agents accessed the invitation link to Cloud Platform A.  Prior to joining the group chat, agents recorded the contents of the group chat dating back to the creation of the group (May 20, 2020). It was determined there were over 130 registered users within the group chat. Many users were actively involved in the distribution of child exploitation material dating back to on or about May 20, 2020. A summary of the approximate number of files and links to cloud-storage websites containing child exploitation material (many contained gigabytes of child pornography files) that was distributed within the group chat are as follows: 129 video files, 324 image files, and 43 cloud-storage weblinks.

29.    Of the 43 cloud-storage weblinks noted above, all have since been removed by Cloud Platform A due to known and unknown parties reporting the weblinks for containing child pornography and or for terms of service violations. Cloud Platform A can only access the content of a cloud account when provided a complete decryption key by a reporting party. Additionally, Cloud Platform A is operated outside the continental United States.

30.     Encountered within Cloud Platform A was a registered user with account username: "not you not me" and email address: hammer1209@yahoo.com (herein referred to as the Subject Account). The Subject Account joined the encrypted group chat on or about June 4, 2020. At the time the Subject Account joined the group chat, numerous image and video files depicting child pornography were shared between various members within the group. A summary of several child pornography image and video files distributed within the group are as follows:

Date Distributed: May 20, 2020

File Name: tara 5yr 045.jpg

Description: This is a color image and depicts a prepubescent female child, nude from the waist down, with her legs spread apart and her vagina exposed. I believe she is a young child based upon the lack of pubic hair and her child-sized legs.

Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

Date Distributed: May 20, 2020

File Name: cp tara ocho años.mp4

Description: This is a color video, which is approximately four minutes and 59 seconds in length. The video begins by depicting a nude prepubescent female child wearing a Venetian-style mask meanwhile orally copulating the

erect penis of an adult male. The video then depicts the prepubescent female child being vaginally penetrated by the erect penis of the same adult male. Prior to the conclusion of the video, the prepubescent female child is depicted orally copulating the erect penis of the same adult male. I believe she is a young child based upon the lack of breast development, lack of pubic hair, and overall body size.

Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

Date Distributed: May 20, 2020

File Name: new__pthc_2007_tara_8yr_-_tara_kinderkutje_pedo_ptsc.wmv

Description: This is a color video, which is approximately three minutes and 20 seconds in length. The video begins by depicting a nude prepubescent female child orally copulating the erect penis of a nude adult male. The video then depicts the adult male orally copulating the vagina of the prepubescent female child. For the remainder of the video, the prepubescent female child is depicted orally copulating the adult male's erect penis. I believe she is a young child based upon her child-like facial features, lack of breast development, and overall body size.

Based on my training and experience, I believe the file depicts at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

26

31.   On or about July 15, 2020, at the request of HSI San Diego, Cloud Platform A produced subscriber information and Internet Protocol (IP) address logs associated with the Subject Account and I have reviewed it in its entirety. The registered email address for the Subject Account is hammer1209@yahoo.com. The Subject Account was created on June 28, 2019 at 12:27:30 AM GMT. This user is a member of one encrypted group chat, has one cloud stored folder with 21 cloud stored files, and 8 active public links. The user last logged into this service using the Subject Account on July 6, 2020.

32.   Based on my training and experience, and previous investigations I have conducted involving Cloud Platform A, I know a user will open a session each time they log in to the service with their password and email combination. One session will be allocated for each device/browser connection and is only closed when the user logs out of the service. A user can be active as many times as they like during that session. Additionally, sessions can be very long-lived, they do not correspond to a single use of the website, and they last from log in until the user logs out, which may be months, or never. The last activity time for a user is based on the most recent last activity of their sessions. I also know the email address listed on the Cloud Platform A account is equivalent to a username.

33.   Numerous IP addresses associated with the Subject Account were provided by Cloud Platform A. A sample of several IP addresses which were captured by Cloud Platform A during the login of the Subject Account are noted below:

> IP Address: 2600:1006:b163:b8ef:d551:8fd8:cd50:e5c4
> Date/Time: April 22, 2020 at 06:05:14 PM (GMT)

Country: United States
Provider: Verizon Wireless

IP Address: 2601:341:8101:15b0:b4f9:e1d9:2c47:7b5f
Date/Time: April 20, 2020 at 09:45:32 PM (GMT)
Country: United States
Provider: Comcast Cable Communications, Inc.

IP Address: 2601:341:8101:15b0:1547:268:95b:c611
Date/Time: April 16, 2020 at 10:21:59 PM (GMT)
Country: United States
Provider: Comcast Cable Communications, Inc.

34.     On August 5, 2020, Verizon Wireless was served with a DHS Summons by HSI SA Sanz requesting subscriber information for the IP address at the above listed date and time. On August 14, 2020, Verizon Wireless provided HSI SA Saenz with subscriber information for the wireless device connected to IP address 2600:1006:b163:b8ef:d551:8fd8:cd50:e5c4 on April 22, 2020 at 06:05:14 PM (GMT) and I have reviewed it. The information provided by Verizon Wireless listed the account as active and the subscriber as Robert Ginder with the same address as the Subject Location. According to Verizon Wireless, the effective date for the account was October 12, 2016 and the phone number on the account is (904) 238-4171.

35.     On September 17, 2020, I was assigned the collateral investigation and reviewed the case during October 2020. On October 5, 2020, I talked to HSI SA Saenz about the investigation and reviewed the list of IP addresses captured by Cloud Platform A for the Subject Account. On October 7, 2020, I caused a summons to be issued to Comcast requesting subscriber information for two of the IP addresses listed above: IP address 2601:341:8101:15b0:b4f9:e1d9:2c47:7b5f on April 20, 2020 at 09:45:32 PM

28

(GMT) and IP address 2601:341:8101:15b0:1547:268:95b:c611 on April 16, 2020 at 10:21:59 PM (GMT). On the same day, Comcast provided the requested information and I have reviewed it. The information provided by Comcast listed one account for both IP addresses. Comcast listed the account as active and the subscriber as Robert Ginder with the same address as the Subject Location. According to Comcast, the phone number listed on the account is (904) 238-4171.

36.     As previously mentioned, the Subject Account joined the encrypted group chat on June 4, 2020. A closer review of the contents of the encrypted group chat that was captured by HSI San Diego agents, revealed the Subject Account joined the encrypted group chat at approximately 11:06 AM (Pacific Daylight Time/San Diego, California). A closer review of the IP addresses provided by Cloud Platform A revealed the Subject Account logged into the Cloud Platform A service approximately 25 times from February 13, 2020 through June 30, 2020. Included in this list, is a log in date and time of June 4, 2020 at approximately 2:04 PM (Eastern Daylight Time/local time), which I learned is the same date and approximate time the Subject Account joined the encrypted group chat. I learned during my review that the Subject Account remained in the encrypted group chat from June 4, 2020 through July 15, 2020.

37.     Also during my review, I discovered numerous images and videos containing child pornography were distributed within the encrypted group chat after the Subject Account actively joined the chat. One specific video file I reviewed was titled "Toddler rape.mp4" and distributed within the encrypted group chat on June 5, 2020. It is described below:

The video is a one minute and 58-second color video with sound that depicts a prepubescent toddler with light colored hair wearing a yellow shirt. A male, who is wearing a red long sleeve shirt and pants, is seen placing the toddler face up on the bed. The male pulls down his pants, exposing his penis, and lays on top of the toddler. The male spreads the toddler's legs and holds both feet above the toddler's head, exposing the toddler's genital area. The male is seen forcing his penis into what appears to be the child's anus with his right hand. The toddler is screaming and crying throughout the video while the male continues to penetrate the toddler's anus.

Based on my training and experience, and also through knowing the toddler in the video appears to be a previously identified child (refer to paragraph 38), I have probable cause to believe that this video depicts at least one minor engaged in sexually explicit conduct, and therefore constitutes child pornography pursuant to 18 U.S.C. § 2256.

38.     I obtained the unique hash value for the video file titled "Toddler rape.mp4". Based on my training and experience, I know that a hash value is a unique identifier based on an algorithm that is specific to a particular video and/or image, and further that hash values are used by law enforcement to identify images and videos that depict child pornography. I learned from the National Center for Missing and Exploited Children (NCMEC) that the exact hash value of the video file described above is associated with an image/video which appears to depict at least one child previously identified by law enforcement.

39.     On October 7, 2020, I conducted additional research on the Subject Location and learned by researching the Florida Driver and Vehicle Identification Database (DAVID) that Robert Arthur Ginder and Andree Michelle Ginder list the Subject Location as their residential address on their driver's licenses. According to DAVID, Robert Arthur Ginder and Andree Michelle Ginder have listed the Subject Location as their residence since the year 2011.

40.     On October 8, 2020, I requested information from the United States Postal Service (USPS) regarding the residential address and received a response on October 9, 2020. According to USPS records, the residents receiving mail at the Subject Location are "The Ginder Household" and "Mr. & Mrs. Ginder".

41.     On October 8, 2020, I conducted a query of the Property Appraiser's Office website in Nassau County, Florida and discovered Robert A & Andree M Ginder are the owners of the residence located at the Subject Location.

42.     On October 9, 2020, I conducted visual surveillance at the Subject Location. At approximately 6:40 AM, I observed the following vehicles at the residence: a gray Chevrolet SUV bearing Florida license plate Z176AS was parked in the driveway facing the residence and a dark green Chevrolet truck was backed in and parked close to the garage. According to DAVID, the two vehicles registered to Robert Arthur Ginder and Andree Michelle Ginder at the Subject Location are a 2020 gray Chevrolet Utility vehicle (Traverse LT) bearing Florida license plate Z176AS and a 2014 green Chevrolet truck (Silverado 1500 LT) bearing Florida license plate UYM8R.

43.     On the same day, I observed a Nassau County Fire and Rescue utility truck

parked in the street in front of the Subject Location. According to open source research, Robert Ginder is a Logistics Officer for Nassau County Fire and Rescue. At approximately 6:50 AM, I observed the gray Chevrolet SUV bearing Florida license plate Z176AS leave the residence. At approximately 7:05 AM, I observed the Nassau County Fire and Rescue utility truck leave the Subject Location.

44.    On October 9, 2020, I caused a summons to be issued to Florida Power and Light requesting information on the residential utility account for the Subject Location and discovered the account is in the name of Robert A Ginder.

45.    On October 9, 2020, I caused a second summons to be issued to Comcast requesting information on the current subscriber of service at the Subject Location. On October 12, 2020, Comcast provided the requested information and I have reviewed it in its entirety. The information provided listed the account as active and the subscriber as Robert Ginder residing at the Subject Location.

46.    On October 9, 2020, I caused a summons to be issued to Verizon Wireless requesting information related to the subscriber of phone number (904) 238-4171, including all devices registered to the subscriber. On October 12, 2020, I received the requested information from Verizon Wireless and reviewed it in its entirety. According to Verizon Wireless, the account is registered to Robert Ginder, residing at the Subject Location. Verizon Wireless lists the following information about the device that is registered on the account: a black, Apple iPhone 11, device ID: 89148000005654601244, IMEI: 356561107058480, IMSI: 311480551405000.

47.    I know from my training and experience, as well as from information found

32

in publicly available materials, that some models of Apple iPhone smart phone devices offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. I am also aware that some models of smart phone devices are equipped with technology that can use a scan of the user's iris or facial features to unlock the device. In my training and experience, users of devices that offer such features often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

48.     On October 14, 2020, I conducted visual surveillance at the Subject Location. At approximately 12:35 PM, I observed the following vehicle at the Subject Location: a dark green Chevrolet truck bearing Florida license plate UYM8R was parked in the driveway facing the residence.

## CONCLUSION

49.     Based on the foregoing, I have probable cause to believe that one or more individuals has used and is using one or more computer devices, smart phones, and/or electronic storage media located in the residence located at 54022 Turning Leaf Drive, Callahan, Florida, 32011, more fully described in Attachment A to this affidavit to, among other things, receive, transport, distribute, possess and seek child pornography. Therefore, I have probable cause to believe that one or more individuals, using the Subject

Location described above has violated 18 U.S.C. §§ 2252 and/or 2252A. Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one computer device and/or other electronic storage media containing images and/or video depicting child pornography, and the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence.

50.    Accordingly, I respectfully request a search warrant be issued by this Court authorizing the search and seizure of the items listed in Attachment B. I also request that in such search warrant this Court authorize law enforcement officers to press the finger(s) (including thumbs) of Robert Ginder to any Apple iPhone device's fingerprint sensor (if one exists), or present his/her iris or face to the device's camera during the search of the residence in an attempt to unlock the device(s) for the purpose of executing the search authorized by this warrant.


ASHLEY WILSON, Special Agent
Homeland Security Investigations



Sworn and subscribed to via telephonic means on this _16_ day of October, 2020, in Jacksonville, Florida:


MONTE C. RICHARDSON
United States Magistrate Judge

34

## ATTACHMENT A

## RESIDENCE TO BE SEARCHED

The residence to be searched is located at 54022 Turning Leaf Drive, Callahan, Florida 32011 and is situated on the east side of Turning Leaf Drive. The residence is a one-story, gray house with white trim. The dark-colored front door can be seen from Turning Leaf Dr and faces west. There is one large window on the front side of the residence. Brown-colored shingles cover the roof and there is a short, paved sidewalk connected to the driveway that leads to the front door. A paved driveway leads to the garage that is in front of the residence. The numbers "54022" can be seen on the front side of the residence above the garage. There is a black mailbox mounted on a white post in front of the residence near the street. The numbers "54022" can be seen on the white post underneath the black mailbox.





2

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEARCHED AND SEIZED

1.     Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones such as an Apple iPhone or a mobile device using the Android operating system, electronic tablets such as an Apple iPad or a tablet using the Android operating system, digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to: visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or distribute, possess, or receive child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs peer to peer software, that may be or are used to: visually depict child pornography (any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2)) or child erotica, display or access information pertaining to a sexual interest in child

pornography; display or access information pertaining to sexual activity with children; or distribute, possess or receive child pornography or child erotica.

3. Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession, receipt, transportation, distribution or seeking of child pornography as defined in 18 U.S.C. § 2256(8) or to the possession, receipt, transportation, distribution or seeking of visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

4. In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

5. Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of seeking, distributing or receiving child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6. Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons

2

transmitting, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

7.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the receipt, transmission, or possession of child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

9.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

3

10.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

11.    Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

12.    Any and all cameras, film, videotapes or other photographic equipment capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

13.    Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate or foreign commerce by any means (including the United States Mail or computer) any child

4

pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

14. Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises described above, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

15. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the premises and capable of being used to produce, manufacture, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

17. Any documents, records, programs or applications relating to the existence of wiping, data elimination, and/or counter-forensic programs (and associated data) that are designed to delete data from the subject computers and computer media.

5

18.     During the execution of the search of the residence located at 54022 Turning Leaf Dr, Callahan, Florida 32011 described in Attachment A, law enforcement personnel are hereby authorized to press the fingers (including thumbs) of Robert Ginder to the fingerprint sensor, or to present his/her iris or face to the camera of the Apple iPhone device(s), found at the subject residence for the purpose of attempting to unlock the device via biometric security in order to search the contents of the device(s) as authorized by this warrant.